LUCAS H. WEETJEN AND OTHERS, RESPONDENTS, *v.* THE ST. PAUL AND PACIFIC RAILROAD COMPANY AND OTHERS, APPELLANTS.

*Railroad bonds — right of bondholders to maintain an action to prevent diversion of property covered by a mortgage given to secure them — bona fide purchasers.*

This action was brought by the holders of certain railroad bonds, secured by a mortgage — which provided that all property subsequently acquired · by the company should become part of the property covered thereby — to restrain the fraudulent diversion of certain iron rails (subsequently acquired by the company), under a resolution of the board of directors authorizing one of the trustees of the mortgage to sell, pledge or dispose of the same, for the purpose of raising money to meet past and future estimates for the construction account of the extension of the road. *Held,* that the plaintiffs were entitled to maintain the action, and that a temporary injunction was properly granted therein.

Part of the iron had, before the commencement of this action, been pledged with firms, of which the said trustee was a member, to secure advances made thereon to the road. *Held,* that the knowledge of the trustees was the knowledge of the firms, and that they could not claim to hold the iron as *bona fide* purchasers without notice.

The secretary of the navy is authorized under the act of congress (14 U. S. Stat. at Large, 64, § 1), to appoint a firm in London to act as his agent in paying drafts drawn by naval officers, and he may, when necessary, exact and receive all such securities as he can obtain to protect his department against loss by reason of the apprehended insolvency of such firm.

APPEAL from orders made at the Special Term, continuing injunction orders during the pendency of the action.

*Thomas H. Hubbard,* for the defendants Moorhead and others. Bondholders must seek their remedies through the trustees who represent them. (*Coal Co.* v. *Blatchford,* 11 Wallace, 172, 177.) The First Division Company had the right to hold and use, for the construction of the extension roads, all the property leased to it by the St. Paul Company (which included all the mortgaged property), and all the proceeds of the $15,000,000 issue of bonds, until there should be a default in paying either the principal or interest of said bonds. It also had the right, under the mortgage, to sell equipment, machinery and implements covered by the mortgage, but unfit or unnecessary for use. By the laws of Minnesota, a mortgage of real estate is a mere security for and an incident to the debt; the mortgagee has no conveyable interest in the mortgaged premises until foreclosure sale, or, at least, until entry after condition broken. (*Hill* v. *Edwards,* 11 Minn., 22, 29; *Greve* v. *Coffin,* 14 id., 345, 353; *Everest* v. *Ferris,* 16 id., 26.) The Supreme Court of the United States has held that, when such is the rule of the State courts, a mortgage given by a railroad company to secure its bonds only confers upon the mortgagee or the bondholders a right to proceed against the mortgaged property upon a given contingency, but that, meantime, the mortgaged property belongs entirely to the company. (*The Cleveland and Ashtabula Railroad Company* v. *Commonwealth of Penn.,* Int. Rev. Rec. of Jan. 31st, 1874, 37, 38; see, also, *Pierce* v. *Emery,* 32 N. H., 484, 514.) If the mortgage, so far as it relates to the iron, is treated as a chattel mortgage, the plaintiffs' position would be no stronger. At best, they would then be mortgagees of chattels in possession of the mortgagor, before default, and under a mortgage reserving to the mortgagor a power of sale. (*Gates* v. *Smith,* 2 Minn., 31, 32; *Chopard* v. *Bayard,* 4 id., 533, 540, 541.)

*Samuel Boardman,* for the defendants Woodruff and Robinson.

*Edmund H. Smith* and *George Bliss,* for the defendant Cutter. The agents of the government acted in good faith, and without knowledge of any alleged lien or conflicting claim upon the iron. The indicia of title, the warehouse receipts, were negotiable, and contained nothing to give the agents of the government ground

for suspicion or knowledge of any irregularities in their transfer. (Laws N. Y., 1830, ch. 179, § 3; Laws N. Y., 1858, ch. 326, § 6; *Rawls* v. *Deshler*, 3 Keyes, 572; *Dows* v. *Green*, 24 N. Y., 638; *Western Trans. Co.* v. *Marshall*, 6 Abb. [N. S.], 280.) The deposit of public money with Jay Cooke, McCulloch & Co., to secure the safety of which the secretary obtained title to the iron, was unquestionably within the official power and duty of the executive officer of the government, and expressly provided for by the following statutes, viz.: Section 1, act of 14th June, 1866 (14 Stat. at Large, 64); section 3620, Revised Statutes United States; section 1, act of 31st January, 1823 (3 Stat. at Large, 723); section 3648, Revised Statutes United States. The secretary of the navy has supervision of and control over the disposition of the public moneys appropriated to the use of the navy department. (2 Stat. at Large, 535; 3 id., 567, 689.) The moneys being, therefore, legally deposited by the secretary for the use and advantage of the government, and being in no sense a loan to or deposit for the use or advantage of the firm of Jay Cooke, McCulloch & Co., it was undoubtedly the duty of the secretary to take all means possible to ensure its safety. (*United States* v. *Tingey*, 4 Pet., 128; see, also, *Dugan* v. *United States*, 3 Wheat., 172; *United States* v. *Bradley*, 10 Pet., 359; *United States* v. *Linn*, 15 id., 290; *Dixon* v. *United States*, 1 Brock., 177; *United States* v. *Maurice*, 2 id., 96; *United States* v. *Admrs. of Lane*, 3 McLean, 365; *Neilson* v. *Lagon*, 12 How. [U. S.], 98; *United States* v. *Mynderse*, 11 Blatch., 1; *United States* v. *Hodson*, 10 Wall., 395.) The title to the iron having been properly acquired by the secretary of the navy, the court cannot interfere with or restrain his disposition of it, as is indirectly, but no less practically, sought to be done by the injunction in this case. The court will not do indirectly what it cannot do directly. (*State of Mississippi* v. *Johnson*, 4 Wall., 475; *McIntyre* v. *Wood*, 7 Cranch, 504; *Murbury* v. *Madison*, 1 id., 137; *McClung* v. *Sullivan*, 2 Wheat., 369; *Kendall* v. *United States*, 12 Pet., 524; *Decatur* v. *Paulding*, 14 id., 497; *Comr. of Patents* v. *Whiteley*, 4 Wall., 532; and see 13 Pet., 608.) The duties of heads of departments, of whom the secretary of the treasury is one, are mainly judicial and discretionary, rather than ministerial. (*Decatur*

v. *Paulding*, *supra*; *Brasher* v. *Mason*, 6 How. [U. S.], 101.) No State court has power to issue the writ of mandamus, and, by parity of reasoning, the writ of injunction, against an officer of the United States for any purpose whatever. His conduct can only be controlled by the power that created him; and because congress has not seen fit to confer the power to issue the writ upon the federal courts, it cannot be considered a reserved power of the States. (*McClury* v. *Silliman*, 6 Wheat., 518; *Kendall* v. *United States*, 12 Pet., 617; 13 id., 608; *Territory* v. *Lockwood*, 3 Wall., 239; *Ladd* v. *Tudor*, 3 Wood. & M., 332.)

*Evarts, Southmayd & Choate*, for the plaintiffs.

DANIELS, J.:

This action has been brought by the owners of mortgage bonds, issued by a corporation known as the First Division of the St. Paul and Pacific Railroad Company, secured by a mortgage executed to three trustees by another corporation called The St. Paul and Pacific Railroad Company, to prevent the improper diversion and misappropriation of property asserted to have become subject to the mortgage. This property consisted of iron rails suitable for constructing the track of the railroad, and purchased and received for that purpose. That was sufficient between the company and the bondholders to render it subject to the mortgage executed for their security; for it was provided in the mortgage, that "any and all rolling stock, equipment and materials whatsoever, which, pursuant" to a lease executed by the St. Paul and Pacific Railroad Company to the other company, "or otherwise, shall or may be acquired or furnished for the use of the said railroads, or either of them, by the said First Division of the St. Paul and Pacific Railroad Company, shall, by the mere acquisition thereof for such use, become and be part and parcel of the property hereinbefore granted, and become and be subject in all respects to the lien and operation thereof, in the same manner and with the same effect as if such property had been acquired by the said party of the first part [which was the St. Paul and Pacific Railroad Company], for such use;" and it gave them a clear equitable right to have these rails devoted to the purpose for which they had been purchased by the

First Division Railroad Company, which would have materially enhanced the value of their security as bondholders. This iron was not applied to that object, but, under a resolution adopted by the board of directors of the company whose duty it was to appropriate it solely to that end, William G. Moorhead, who seems to have been the acting man of the three trustees to whom the mortgage for the benefit and security of the bondholders was given, and who was also the construction agent of the company, was authorized to pledge, hypothecate, sell or dispose of the iron rails of the company, then in New York or elsewhere, or afterward to arrive, for such sums and on such terms, as were in his judgment best for the interest of the company, for the purpose of raising the money necessary to meet past and future estimates for construction account of the extensions of the railroads, and for duties, freights and advances on the same account; and Moorhead, under and pursuant to that authority, disposed of the railroad iron in controversy in the present action. This was in plain violation of the terms of the mortgage, and how far it might be excused by the urgent financial necessities of the company, when done in entire good faith, it is not necessary at the present time to inquire, for, although it is claimed in the defendants' pleadings and affidavits, that an emergency of that nature existed, the facts are not sufficiently before the court to justify a determination on that subject in their favor. To warrant such a diversion of the property solemnly appropriated to the construction of the road, and the increase of the security of those persons who advanced their money to build it, would certainly require the establishment of an urgent and clear necessity that could be financially provided for in no other way; and its existence has not been yet maintained by the papers produced on the part of the defendants. The utmost good faith is required in transactions of this nature, and that can only be made to appear by a minute exhibition of all the facts and circumstances of the case, as distinguished from the general statement relied upon in support of what must be considered, under ordinary circumstances, a misappropriation of the company's property. As these iron rails were acquired after the mortgage was made and delivered, they became a part of the security only in equity against persons buying them with notice of the facts, or without parting with value for them. To that

extent the bondholders had an equitable right that they should be used only for the purpose for which they had been bought, and that was to construct the railroad track with them. That was not done; but, by the confederation and collusion of the company and the acting trustee, whose duty it certainly was to protect the security he had taken for the bondholders to the utmost of his ability, the rails were disposed of to other persons, and large amounts of money raised from their sale and hypothecation. If the company could not have raised the money to meet its pressing wants in any other way, no convincing reason exists for believing that the very large amounts obtained on the iron were needed for that purpose, and the resolution of the directors imposed no such restraint on the power given Moorhead to pledge, sell or dispose of it. He was not merely authorized to sell such as might prove absolutely necessary to meet the company's financial wants, but he was empowered to go much further than that, and, without restraint, sell all the iron rails of the company in New York or elsewhere, including those afterward to arrive. The sales were chiefly made to the firms of Vibbard, Foote & Co., Jay Cooke & Co. and Jay Cooke, McCulloch & Co., and they were all made under the agency, management and authority of Moorhead, acting at the time in the double, and, perhaps, not quite consistent, capacities of construction agent for the company and trustee of the bondholders. As one of the trustees named in the mortgage given to secure the bonds, he was chargeable with, and undoubtedly had complete knowledge of, the provision, already mentioned, which was contained in it, and he consequently knew that it was the right of the bondholders to have the iron used for the sole purpose of constructing the railroad; and the facts warrant the conclusion that he must have understood that to be the case when he made the disposition which he did of the iron now in suit; and having that knowledge and understanding, it invalidated the sales made to Jay Cooke & Co., and to Jay Cooke, McCulloch & Co., because he was a member of both those firms. The fact that he did not directly participate in the active management of the business of those firms, can make no difference in the case. He was one of the partners, and for that reason actual notice to him was constructive notice to his associates. It was his duty to communicate what he knew on these subjects to them, and if he did

not, they, and not innocent third persons, must sustain the consequences resulting from the want of it. (Lindley on Partnership [3d ed.], 304, 305.) They, having such notice, acquired the rails subject to the bondholders' equity to have them applied to the purpose for which they had been originally bought, and that was the construction of the track of the railroad. Those sold to Vibbard Foote & Co., were also subjected to the same equity, for it appeared while they took the nominal title to them, Jay Cooke & Co. actually advanced the money for them, and in the end, all that remained unsold were, by an actual transfer, turned over to the firm of Jay Cooke, McCulloch & Co. But even if the purchase by Vibbard, Foote & Co. could be, and should be, sustained, as having been made in good faith and for a valuable consideration advanced, that right was lost by the sale to Jay Cooke, McCulloch & Co., because Moorhead was a partner in that firm, and his knowledge of the plaintiffs' equity, which would be defeated only by a *bona fide* sale of the iron, prevented himself and the firm of which he was a member from succeeding to any *bona fide* title Vibbard, Foote & Co. might have innocently acquired by advancing their money for it, if they had done so in good faith, and in ignorance of that equity, for the wrongdoer is not allowed to profit by the acquisition of another *bona fide* title, when that has been created by his own misconduct or breach of trust. (1 Story's Eq. Jur. [11th ed.], § 410 ; *Kennedy v. Daly*, 1 Schoales & Lefroy, 555, 379.) Consequently, when Jay Cooke, McCulloch & Co. received the iron Vibbard, Foote & Co. had on hand, unsold, their title to it was no better than it was to that which had been directly transferred to them by Moorhead, and also to the firm of Jay Cooke & Co. In their hands it was subject to the plaintiffs' equity to have it applied to the construction of the railroad, requiring that it should be devoted to the construction of the road ; and whether their advances wholly or partially can be properly reimbursed out of its value, must depend upon circumstances, if they exist, not now fully before the court. For the present purposes of the litigation, it must be concluded, from the knowledge Moorhead must have had, that both the firms of Jay Cooke & Co. and Jay Cooke, McCulloch & Co., held the

iron in their hands subject to the equitable rights of the bondholders under the mortgage.

A portion of the iron, amounting to 1,647 tons, was transferred by Jay Cooke, McCulloch & Co. to the secretary of the navy of the United States, to secure a balance in their hands to his credit. They were the agents at London, through whom drafts were paid, which were properly drawn by naval officers in the service of the United States, in different portions of the world. There was nothing improper in the establishment of this agency. It had been maintained for many years, and was required for the convenient disbursement of funds to be used to meet the expenses of the distant operations of the naval department of the United States government; and it was clearly authorized by the provision made by an act of congress, which declared that: " In places where there is no treasurer or assistant treasurer, the secretary of the treasury may, when he deems it essential to the public interest, specially authorize in writing the deposit of such public money in any other public depository, or in writing authorize the same to be kept in any other manner, and under such rules and regulations as he may deem most safe and effectual to facilitate the payments to public creditors." (14 U. S. Statutes at Large, 64, § 1.) That seems to have been broad enough to sanction the disbursement of public moneys for the distant uses of the navy through such an agency, as appears by the affidavits produced, to have been maintained at London with the firm of Jay Cooke, McCulloch & Co. And it was not shown to have been established without the sanction or authority of the secretary of the treasury. But whether it did or not, after the public moneys had found their way for legitimate public purposes into their hands, it was entirely lawful and proper for the secretary of the navy to exact and receive all such securities as he could obtain, to protect his department against loss by reason of their apprehended insolvency. And that authorized him to receive a transfer of the 1,647 tons of the iron, and to hold it for his reimbursement, so far as the firm had any interest in it, if any such they may hereafter appear to have, which may prove to be paramount to the present claims of the bondholders. At the time when this transfer was made, the money was

in the hands of Jay Cooke, McCulloch & Co. on deposit. · It was a mere debt, therefore, due on call; and in the condition of the affairs of this firm at that time, there seems to have been nothing which the secretary of the navy or any agencies he might employ, could do, which would have resulted in the recovery of the money. He, therefore, relinquished nothing for the transfer he received of the iron. But it was taken as a mere security for a precedent debt, which gave him the same and no better title to it, than that which Jay Cooke, McCulloch & Co. then had themselves; and that, because of Moorhead's knowledge, was subject to the plaintiffs' equity. The other transfer made of the 4,446 tons of the iron, was for a consideration of £100,000 sterling advanced at the time. This was placed in their hands for the same purposes as the preceding deposits, and for that reason it was lawful in its character, although plainly injudicious, because of the financial embarrassments in which the firm of Jay Cooke, McCulloch & Co. were at the time involved. But as it was lawfully made, the secretary had the undoubted right to take a transfer of this iron as its security. And that was evidently done in good faith, believing that Jay Cooke, McCulloch & Co. had a complete title, and a perfect right to transfer the iron. That, at the time of it, was a valid transaction, for it was without notice of the plaintiffs' equity; and if it had been clearly made to appear that the security and debt still remained the same, the injunction should be modified so far as to allow a sale to be made of so much as would be required for the payment of the advance then made. But it was not; and as the deposit was made to meet drafts drawn on the naval department, and payable through its agency in London, the advance may have been greatly reduced, or entirely disbursed, and the right to hold this iron correspondingly diminished, or wholly extinguished. For that reason it is uncertain what interest the secretary of the navy may still retain in this iron. That can be properly ascertained upon a hearing of the cause; and the injunction should not be modified so as to permit a sale by him, until the interest he still has in it, has been legally established. The iron is now within the lawful jurisdiction, and subject to the equitable authority of this court, and that should be maintained for the purpose of securing all the equitable rights which the

plaintiffs and those represented by them may be entitled to in it. The secretary himself is not subject to the jurisdiction or. authority of the court, but this iron is found in the hands of other persons who are, and who assert his interest in it for their own protection, in attempting to withhold it from the plaintiffs' claim to it. Having jurisdiction over them, and over the property in their hands, no good reason appears why they should not be restrained from parting with it, until it can be ascertained who may be able to establish the paramount right to it. Presumptively, that is now in the plaintiffs, and that can only be overcome by proof that the advance which was made on the faith of it has not been paid, or that further advances made in good faith on its security are still outstanding. So far as this, as well as the preceding iron may be involved in the present controversy, and the unpaid balances due for iron otherwise sold, the present injunction must be maintained; the ends of justice cannot, certainly, be secured without it. But as to so much iron as was transferred to the New York Guaranty and Indemnity Company, the case is clearly different, for the answer and the affidavits produced in its behalf show a very plain case in its favor. That company advanced its money in good faith, on complete evidence of Moorhead's right to dispose of it as he did, and without either actual or constructive notice of the equity existing in the plaintiffs' favor, and it, therefore, has a clear right to sell the iron pledged to it, for its own reimbursements, as its debt was shown to be overdue. But if any balance should remain, beyond what may be required for that purpose and the payment of interest and necessary expenses, that must be still retained subject to the injunction, until the rights of the other parties to it have been ascertained by means of a trial. That balance, whatever the amount of it may prove to be, was one of the items finally transferred to the secretary of the navy, and his right to receive it is subject to his ability, or that of those who are before the court representing his interests, to show that the moneys advanced on the faith and security of it, still continue to be unpaid.

No doubt can be entertained as to the plaintiffs' right to maintain this action on their own account and for the protection of the interests of others similarly situated. If they could not do so, their rights and interests would be wholly without protection,

for the directors of the company directed the disposition which was made of the iron in violation of the plain terms of the mortgage, and it may, under the circumstances shown by the affidavits, be inferred that the other trustees acquiesced in the acts of Moorhead, to whom the active management of the business appears to have been intrusted by them. They certainly were not shown to have dissented in any way, or to have disapproved of what he did, and it was not even claimed that they were opposed to the disposition he attempted to make of the property. It was highly probable that all were concerned in the execution of the same purpose, and intrusted it to his management to effect it; and when that is the case, the parties ultimately interested are entitled to institute proceedings in their own names for their own protection. (*Watson* v. *Sutherland*, 5 Wall., 74; *Memphis City* v. *Dean*, 8 id., 65, 73; *Bate* v. *Graham*, 1 Kern., 237; *Gray* v. *New York and Virginia Steamship Co.*, 10 S. C., 383; Angell & Ames on Corp. [4th ed.], §§ 391–393.)

The orders should be modified to the extent before suggested, with ten dollars costs, besides disbursements, to the New York Guaranty and Indemnity Company, and affirmed in all other respects, with ten dollars costs, besides disbursements, to the plaintiffs against the other defendants, but with leave to the defendant Cutter to renew the motion to vacate the injunction, so far as it restrained the sale of the iron transferred to secure the advance of the £100,000 sterling, in case that or any considerable portion of the same can be shown to be still unpaid.

Davis, P. J., and Brady, J., concurred.

Ordered accordingly